UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOYCE WHITE, et al., | CASE NO. C25-1361-KKE |
| Plaintiff(s), | ORDER ON MOTION TO DISMISS |
| v. | |
| CHIME FINANCIAL INC., | |
| Defendant(s). | |

Plaintiff Joyce White brings this putative class action against Defendant Chime Financial Inc. ("Chime"), asserting claims under Washington's Commercial Electronic Mail Act ("CEMA") and Washington's Consumer Protection Act ("CPA").  Presently before the Court is Chime's motion to dismiss the consolidated class action complaint (Dkt No. 18) and its request for incorporation by reference and judicial notice of certain documents.  Dkt. Nos. 25, 26.  The motions have been fully briefed, and the Court has considered the oral argument of counsel.  Dkt. Nos. 25, 26, 31, 32, 35, 36, 43.  For the reasons below, the Court grants the motion for incorporation by reference and denies the motion to dismiss.

## I.   BACKGROUND

Chime is a financial technology company that offers various banking products and services through both its website and mobile application.  Dkt. No. 18 ¶ 1.  Chime promotes the use of its banking products and services through its referral marketing program, which includes the refer-a-

friend ("RAF") program. *Id.* ¶ 17. Using the Chime mobile application, in "just a few taps," Chime users can select one or more contacts from their phone and transmit a pre-populated marketing text message, which includes a customized referral link prompting recipients to download the Chime app. *Id.* ¶ 18.

White alleges that the RAF program is "prominently promoted" within the mobile application, being featured at the top of the main application page. *See id.* ¶ 18 (Figure 1: screen capture of top of account page showing "Get $100" button). Upon tapping the "Get $100" button, users are taken to a page that allows them to transmit a pre-written marketing message to the user's phone contacts. *See id.* ¶ 20. Next to each contact's name is another "Get $100" button. *Id.* When the user taps "Get $100" next to a particular contact's name, the Chime application opens the text messaging application on the phone, and inserts a pre-composed marketing message and referral link. *Id.* ¶ 21. "The only additional action the user must take" is to tap the "send message" icon. *Id.* White, who received a RAF text message without her consent, alleges that Chime's RAF program violates both the CEMA and CPA. *Id.* ¶ 4.

Chime filed a motion to dismiss, as well as a motion for judicial notice and incorporation by reference. Dkt. No. 25. After considering the parties' briefing and oral argument, the Court grants the motion for incorporation by reference and denies the motion to dismiss for the following reasons.

## II.   ANALYSIS

### A.    Legal Standard

In evaluating a motion to dismiss under Rule 12(b)(6), a court examines the complaint to determine whether, assuming the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if "the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**B.      Judicial Notice and Incorporation by Reference**

Chime asks the Court to consider the following documents under the doctrines of incorporation-by-reference or judicial notice: Chime's May 13, 2025 Form S-1 Registration Statement; Chime's March 24, 2025 blog post titled "Chime's Referral Program: Everything You Need to Know"; and former plaintiff Charles Taft's original complaint.  Dkt. No. 26.

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint[.]" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).   "When 'matters outside the pleading are presented to and not excluded by the court,' the 12(b)(6) motion converts into a motion for summary judgment under Rule 56."  *Id.* (quoting Fed. R. Civ. P. 12(d)).  "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201."  *Id.*

The incorporation-by-reference doctrine "treats certain documents as though they are part of the complaint itself" and is intended to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  *Id.* at 1002.   While a defendant may seek to incorporate a document into the complaint by reference where "the plaintiff refers extensively" to it or "the document forms the basis of the plaintiff's claim," "the mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Id.* (first quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003), and then quoting *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)).

"Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'"  *Id.* at 999 (quoting Fed. R. Evid. 201(b)).  "A fact is 'not subject

ORDER ON MOTION TO DISMISS - 3

to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)). Though a court may take judicial notice of undisputed facts contained in public records, it "cannot take judicial notice of disputed facts contained in such public records." *Id.*

    1.  The Court will take judicial notice of former plaintiff Taft Charles's complaint.

Chime asks the Court to take judicial notice of former plaintiff Taft Charles's previously-filed complaint. Dkt. No. 26 at 4. Plaintiff does not object to the Court considering Charles's original complaint (Dkt. No. 32 at 3), and thus, the Court grants Chime's motion for judicial notice of that document. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of pleadings and documents filed in parallel litigation, as they were "readily verifiable and, therefore, the proper subject of judicial notice").

    2.  The amended complaint incorporates Chime's May 13, 2025 Form S-1 Registration Statement and March 24, 2025 RAF Blog Post by reference.

Chime also asks the Court to consider, through either incorporation-by-reference or judicial notice, its May 13, 2025 Form S-1 Registration Statement, filed with the Securities and Exchange Commission, as well as its March 24, 2025 blog post detailing its RAF program. Dkt. No. 26 at 3–4. White counters that because her claims do not rely on the existence of either the S-1 Registration statement or the blog post, neither document is properly subject to incorporation-by-reference. Dkt. No. 32 at 3–4. She also opposes judicial notice of the documents, arguing that Chime cannot "gesture[] at entire documents" through incorporation-by-reference or judicial notice without explaining how "those documents demonstrate that the allegations are inaccurate or untrue." *Id.* However, because the amended complaint references and includes links to both Chime's S-1 Registration Statement and its blog post and relies on facts stated therein to support White's claims, *see* Dkt. No. 18 at 2 n.2, 15 n.6, both documents are properly considered under

ORDER ON MOTION TO DISMISS - 4

the incorporation-by-reference doctrine.  *See, e.g.*, *Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, 941 n.2 (N.D. Cal. 2024) (finding documents incorporated by reference "because Plaintiff's complaint makes allegations regarding [their] existence"); *also Dfinity Found v. Meta Platforms, Inc.*, 22-CV-2632-CRB, 2022 WL 16857036, at *1 n.1 (N.D. Cal. Nov. 10, 2022) (same where document was "quoted in and linked in the complaint").

### C.    White Has Stated Claims for Violation of CEMA and the CPA.[1]

CEMA imposes liability for persons conducting business in Washington who "initiate or assist" in transmitting a commercial text message to a telephone number assigned to a Washington resident's cell phone.  WASH. REV. CODE § 19.190.060(1).  CEMA defines "assist the transmission" of a text message as the provision of "substantial assistance or support which enables any person to formulate, compose, send, originate, initiate, or transmit" a commercial text message "when the person providing the assistance knows or consciously avoids knowing that the initiator of the [text message]" will or intends to violate the CPA.  *Id.* § 19.190.010(1).  CEMA specifies that the practice of sending such a commercial text message as "an unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose of applying the [CPA]."  *Id.* § 19.190.060(2).

White's complaint alleges that Chime both initiated and, through the RAF program, assisted its customers in transmitting commercial text messages in violation of CEMA.  Dkt. No. 18 ¶¶ 13, 28.  In support of her allegations, White highlights several of Chime's mobile application features, including "Get $100" buttons that appear throughout the application, including next to users' phone contacts (*see* Dkt. No. 18 ¶¶ 19–24).  When a user clicks a "Get $100" button, they

---

[1] A violation of CEMA "automatically constitutes a CPA violation."  *Moore v. Robinhood Fin. LLC*, 2:21-CV-01571-BJR, 2022 WL 3082969, at *2 (W.D. Wash. Aug. 3, 2022) (citing *Wright v. Lyft, Inc.*, 406 P.3d 1149, 1153 (Wash. 2017)); *see also Jensen v. Capital One Fin. Corp.*, C24-0727-KKE, 2025 WL 606194, at *5 (W.D. Wash. Feb. 25, 2025) (Plaintiff's "CPA claim and CEMA claim rise and fall together").  Thus, the Court analyzes the motion to dismiss under CEMA.

ORDER ON MOTION TO DISMISS - 5

initiate pre-written text messages referring their contacts to use Chime. *See* Dkt. No. 18 ¶ 21. Such features, in White's view, amount to substantial assistance to Chime's users in sending referral texts. In the alternative, White posits that Chime users who use the referral program "act as agents of Chime," and thus, Chime itself initiates transmission of the messages in violation of CEMA. Dkt. No. 18 ¶ 30. [2]

Chime makes three arguments in support of its motion to dismiss. First, Chime contends its RAF conduct falls within CEMA's exception for activity related to a product with a "commercially significant use." Dkt. No. 25 at 9–12. Chime next argues that Plaintiff cannot show it assisted the transmission of text messages because she does not plausibly allege CEMA's knowledge requirement. *Id.* at 12–15. Finally, Chime suggests that, given CEMA's legislative purpose, the Court should not read its "assistance" provision as applying to its RAF program. *Id.* at 15–16. The Court considers each of these arguments in turn.

    1.  <u>Chime's alleged conduct does not fall within CEMA's exception for activity related to a product with a "commercially significant use."</u>

Chime argues that its RAF program is expressly excluded from CEMA's definition of "assist the transmission," and thus, it cannot be subject to CEMA liability for RAF text messages, pointing to a 2005 amendment that excepts activities which constitute commercially significant uses other than to violate CEMA. Dkt. No. 25 at 15 (citing WASH. REV. CODE § 19.190.010(1)(b)). Chime argues this amendment reflects the legislature's "express intent" to limit "secondary liability" of businesses such as Chime for facilitating communications between third parties. *Id.* In Chime's view, the RAF program serves a "commercially significant use" other than to violate

---

[2] Because the Court finds that White's complaint states a CEMA claim under a theory of substantial assistance, the Court need not assess whether the initiation/agency theory is also plausible. *See* Fed. R. Civ. P. 8(d)(2); *Floyd Blinsky Trucking, Inc. v. Navistar, Inc.*, No. C15-5467 BHS, 2020 WL 7043299, at *2 (W.D. Wash. Dec. 1, 2020) (finding it improper to dismiss an alternate theory of liability via a motion to dismiss for failure to state a claim, where one theory has been sufficiently pleaded).

ORDER ON MOTION TO DISMISS - 6

CEMA because it "fosters the provision of access to liquidity and other banking products and services through trusted community connections and is integral to Chime's business goals," and is thus exempted under Wash. Rev. Code § 19.190.010(1)(b). Dkt. No. 25 at 15. In response, White argues that the CEMA exceptions under Wash. Rev. Code § 19.190.010(1)(a)–(b) were meant primarily to protect telecommunications service providers, and that Chime's construction of the exceptions would swallow the rule. For the reasons below, the Court agrees with White and finds that the RAF program does not fit within either CEMA exception.

When interpreting a statute, a federal court must "determine what meaning the state's highest court would give to the law," and thus, must "follow the state's rules of statutory interpretation." *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998 (9th Cir. 2017) (quoting *Bass v. Cnty. of Butte*, 458 F.3d 978, 981 (9th Cir. 2006)). Under Washington law, the "fundamental objective" of statutory interpretation "is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Thurston Cnty. ex rel. Snaza v. City of Olympia*, 440 P.3d 988, 991 (Wash. 2019) (citation omitted). Where the language in a statute is ambiguous and "remains susceptible to more than one reasonable meaning," the Court resorts to the statute's legislative history. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 43 P.3d 4, 10 (Wash. 2002). The Washington Supreme Court has instructed courts to construe consumer protection statutes such as CEMA "liberally in favor of the consumers they aim to protect." *Jametsky v. Olsen*, 317 P.3d 1003, 1007 (Wash. 2014). The Court begins its inquiry with the plain language of the statute.

As noted above, CEMA carves out two exceptions to liability for conduct that would otherwise "assist the transmission" of an unsolicited text message in violation of CEMA:

> (a) Activities of an electronic mail service provider or other entity who provides intermediary transmission service in sending or receiving electronic mail, or

provides to users of electronic mail services the ability to send, receive, or compose electronic mail; or

(b) activities of any entity related to the design, manufacture, or distribution of any technology, product, or component that has a commercially significant use other than to violate or circumvent this section.

WASH. REV. CODE § 19.190.010(1)(a)–(b).  The Washington legislature added these exceptions as part of a series of amendments to CEMA in 2005.  *See* 2005 Wash. Laws Ch. 378 §§ 1–5.

Subsection (a) applies to the "[a]ctivities of an email service provider" or any other entity "who provides intermediary transmission service in sending or receiving electronic mail."  WASH. REV. CODE § 19.190.010(1)(a).  Subsection (b)—on which Chime relies—applies to the activities of "any entity related to the design, manufacture, or distribution of any technology, product or component that has a commercially significant use other than to violate [CEMA]."  *Id.* § 19.190.010(1)(b).  At oral argument, White asserted that the express reference to email service providers in subsection (a), taken together with the legislative history and structure of the statute, indicates that the legislature intended subsection (b) to primarily apply to telecommunications service providers.  Chime counters that subsection (b) applies to "any entity" and provides no limit as to which alternate uses are "commercially significant" enough to trigger the exception.

Though the statute itself is not especially clear, the Court finds White's interpretation more persuasive.  Washington courts will not "construe statutory text as 'superfluous, void, or insignificant' if any other reasonable interpretation exists."  *Freedom Found. v. Teamsters Loc. 117 Segregated Fund*, 480 P.3d 1119, 1128 (Wash.  2021) (quoting *Ralph v. Dep't of Nat. Res.*, 343 P.3d 342, 345 (Wash. 2014)).  Chime's reading of subsection (b) would mean that any company could avoid liability for communications that violate CEMA by claiming some alternate use, so long as that use is "commercially significant."  This broad construction would render CEMA's general prohibition on commercial text messages superfluous and obviate the need for

ORDER ON MOTION TO DISMISS - 8

subsection (a).  *See Qwest Corp. v. City of Kent*, 139 P.3d 1091, 1093 (Wash. 2006) (rejecting interpretation of statute that would result in an exception swallowing the rule).  Such an expansive approach would also contravene the required liberal construction of consumer protection laws. *Jametsky*, 317 P.3d at 1007.

At the same time, as Chime observed at oral argument, subsection (b) must be read to have *some* meaning.  Yet the statute does not clearly specify what entities subsection (b) protects or what types of activities "related to the design, manufacture, or distribution of any technology, product or component" are "commercially significant."  To resolve this ambiguity, the Court looks to CEMA's legislative history.  *See Campbell & Gwinn, LLC*, 43 P.3d at 10.

Between 2003 and 2005, the Washington legislature twice amended CEMA to address emerging telecommunications technologies and related issues.  First, in 2003, the legislature amended the statute to include text messaging.  2003 Wash. Laws 137 § 1.  The bill report of the House Committee on Technology, Telecommunications & Energy summarized the impact of the 2003 amendments as "Prohibit[ing] businesses in the state of Washington from sending commercial electronic text messages to a telephone number assigned to a Washington resident for cellular or page service equipped with short message capability."  Dkt. No. 25-1 at 20.  The bill report further "clarifie[d] that the cellular or pager service provider is not liable for merely acting as an intermediary," but nevertheless "may be liable if they provide assistance knowing that messages are being sent in violation of the law."  *Id.* at 21–22.  The report acknowledged that the 2003 amendments were drafted to address the fact that "text messages sent to cellular phones or pagers" did not, at that time, "fall within current regulations and restrictions."  *Id.* at 20.

In 2005, the legislature again amended CEMA to address e-mail and the internet.  *See* Dkt. No. 25-1 at 13–18 (legislature adding, among other things, definitions of "Electronic mail message" and "Internet," as well as a prohibition on phishing).  These amendments included the

ORDER ON MOTION TO DISMISS - 9

"assist the transmission" exceptions now at issue. Although the legislative history of these exceptions is scant, the legislature's notes about the exceptions read: "<u>EFFECT:</u> Excludes intermediary e-mail providers from liability under this act. Clarifies that an individual may only bring an action against a person or entity that directly violates this act." Dkt. No. 25-1 at 19.

Although Chime asserts that the exceptions were intended to provide businesses like Chime protection from "secondary liability," the plain language of both the legislature's notes and the statute's text more narrowly express an intent to provide protection to telecommunications intermediaries—that is, entities that provide a product or service that CEMA violators use to send unsolicited messages. *See* Dkt. No. 25-1 at 12 (2003 amendments providing protection from liability to cellular or pager services "for serving merely as an intermediary between the sender and the recipient"); *id.* at 19 (2005 legislative notes explaining the "assist the transmission" exceptions were meant to "[e]xclude[] intermediary e-mail service providers from liability" and clarify that liability attaches only where "a person or entity [] directly violates" CEMA).

Chime asserts that the RAF program nonetheless satisfies subsection (b) because it has a "commercially significant use"; namely, "to let Chime members share Chime's features in a trusted, person-to-person setting." Dkt. No. 25 at 15. This argument fails for two reasons. First, as discussed above, the legislative history supports White's claim that the term "commercially significant use" is intended to apply to products and technologies similar to email, cellular, and pager services, or other telecommunications services, which were the focus of the legislature when it drafted the amendments. Nowhere in the legislative history did the Washington legislature express an intent to protect other types of entities (such as banks or financial technology companies like Chime), or to exempt from CEMA a bank's referral program (even as described by Chime).

Second, even if the exceptions were not limited to telecommunications providers and similar technologies, Chime's claim that its RAF program itself is a commercially significant use

is insufficient, at this stage, to defeat White's allegations that the program directly violates CEMA.[3]  Moreover, it is unclear how Chime's claimed "commercially significant uses" differ from the features of any refer-a-friend program.  As another judge in this district observed, "[w]ere the Court to apply [this] broad reading of the exemption[,] almost every [product] would be excluded from liability" as most products could be said to "serve a purpose other than to violate CEMA."  *Bottoms v. Block, Inc.*, 23-1969 MJP, 2024 WL 1931690, at *5 (W.D. Wash. May 2, 2024).[4]  And despite Chime's description of its RAF program, White plausibly alleges the RAF texts violated CEMA because they "promot[ed] [Chime's] products and services[.]"  Dkt. No. 18 ¶ 50.  Chime's claim that some customers view the RAF positively does not, at the motion-to-dismiss stage, undermine White's own well-pleaded allegations that the text messages were unsolicited and commercial in nature.

Finally, Chime argues that White herself acknowledges that there is a "primary purpose of the [RAF] program that is not to violate or circumvent CEMA."  Dkt. No. 35 at 7.  In support of this argument, Chime points to White's complaint, which alleges:

> The primary purpose of the message and the accompanying hyperlink is to induce the recipient to funnel earnings to a Chime-affiliated checking account via direct deposit and access those funds using a Chime Visa Debit Card, which generates revenue for Chime in the form of, *inter alia*, interchange fees and ATM fees.

---

[3] Notwithstanding protection for secondary liability, the Washington legislature contemplated that even email and cellular service providers could still be held liable under CEMA where their actions directly violate the statute.  *See* Dkt. No. 25-1 at 19, 22.  Thus, even assuming, for the sake of argument, that the RAF program constitutes a technology, product or component with a commercially significant use, Chime could still be liable for any direct CEMA violations such as those alleged by White.

[4] Chime attempts to distinguish this case from *Bottoms v. Block, Inc.*, 23-1969 MJP, 2024 WL 1931690 (W.D. Wash. May 2, 2024).  Dkt. No. 25 at 16–17.  In *Block*, as here, the plaintiff alleged that the defendant's a refer-a-friend program violated CEMA's prohibition against assisting the transmission of commercial text messages.  2024 WL 1931690, at *2–3.  In its motion to dismiss, the *Block* defendant argued that the subsection (b) exception applied because its phone application, which was used to send referral messages, had commercially significant uses other than to violate CEMA.  *Id.* at *5.  The *Block* court denied the motion to dismiss because the defendant failed to show that the refer-a-friend program itself—as opposed to the phone application—had a commercially significant use other than to violate CEMA.  *Id.*  Chime argues *Block* is distinguishable because Chime's RAF itself has a commercially significant use other than to violate CEMA.  Dkt. No. 25 at 16–17.  But Chime's factual claims about the value of the RAF are not properly before the Court on a motion to dismiss.  As such, *Block*'s reasoning applies equally here.  2024 WL 1931690, at *5.

ORDER ON MOTION TO DISMISS - 11

Dkt. No. 35 at 7 (citing Dkt. No. 18 ¶ 63).  The Court disagrees that this allegation concedes the RAF program is a "technology, product, or component with a commercially significant use" such that § 19.190.010(1)(b) applies.  Moreover, this portion of the complaint explains the purpose of the messages that the Chime application pre-populates, not the purpose of the RAF program itself. *Id.*  Regardless, even if the purpose of the RAF program is to generate revenue for Chime, that fact alone does not preclude the RAF program from otherwise violating CEMA.

In sum, the exceptions in §§ 19.190.010(1)(a)–(b) do not apply to Chime's RAF program.

2.  White sufficiently alleges Chime knew or avoided knowing its users sent messages without consent, in violation of CEMA.

CEMA defines assisting in the transmission as

[A]ctions taken by a person to provide substantial assistance or support which enables any person to formulate, compose, send, originate, initiate, or transmit a commercial electronic mail message or a commercial electronic text message when the person providing the assistance knows or consciously avoids knowing that the initiator of the commercial electronic mail message or the commercial electronic text message is engaged, or intends to engage, in any practice that violates the consumer protection act.

WASH. REV. CODE § 19.190.010(1).

White alleges that Chime knows or consciously avoids knowing whether its users send RAF text messages without obtaining the recipients' clear and affirmative consent in advance, in violation of CEMA.  Dkt. No. 18 ¶ 29 (citing WASH. REV. CODE § 19.190.070).  Chime counters with several reasons that White has not plausibly alleged that Chime "knew or consciously avoided knowing that the senders … were engaged or intending to engage in a practice violating the CPA when they sent the texts."  Dkt. No. 25 at 12 (citing *Moore v. Robinhood Fin. LLC*, No. 21-CV-01571, 2022 WL 3082969, at *4 (W.D. Wash. Aug. 3, 2022)).

ORDER ON MOTION TO DISMISS - 12

First, without citing any authority, Chime suggests that the "friend-to-friend" structure of its RAF program in fact "makes it less plausible that the texts were sent without the recipient's consent." *Id.* at 18. Relatedly, Chime posits that the success of the RAF program and "recipients' positive reactions to RAF texts," undermine that it knows or avoids knowing recipients do not consent to receive RAF text messages. *Id.* at 18–19. Chime states that recipients' positive reactions further "suggest[] that many if not most recipients in fact do welcome and consent to receive RAF texts." *Id.* at 18. White counters that it "does not matter that Chime enables text messages between friends or other trusted contacts" because "CEMA does not provide an exemption for unsolicited commercial electronic text messages sent by a friend." Dkt. No. 31 at 13 (citing *Aaland v. CRST Home Sols., LLC*, 575 P.3d 1279, 1286 (Wash. Ct. App. 2025)). The Court agrees with White.

As White points out, multiple courts in this district have denied motions to dismiss CEMA and CPA claims concerning similar refer-a-friend programs that "rel[ied] on one-on-one communications between trusted friends and contacts." Dkt. No. 25 at 12–13; *see, e.g.*, *Jensen v. Cap. One Fin. Corp.*, No. C24-0727-KKE, 2025 WL 606194, at *5 (W.D. Wash. Feb. 25, 2025); *Robinhood Fin. LLC*, 2022 WL 3082969, at *4; *Wright v. Lyft, Inc.*, No. 2:14-cv-00421, 2016 WL 7971290, *7 (W.D. Wash. Apr. 15, 2016); *Block, Inc.*, 2024 WL 1931690, at *4. Although CEMA provides certain narrow statutory exceptions, including where a recipient "has clearly and affirmatively consented in advance to receive these text messages," Chime points to no exceptions for friends or trusted contacts generally. *See* WASH. REV. CODE § 19.190.070(1)(b). Crucially, White affirmatively alleges (and thus the Court takes as true) that she and other Washington residents who are recipients of RAF messages "did not provide advance consent to receive Chime referral messages." Dkt. No. 18 ¶¶ 4, 17. Thus, at this juncture, Chime's argument that it is "more plausible" that recipients of RAF messages consented to receiving them fails. Dkt. No. 25 at 17.

ORDER ON MOTION TO DISMISS - 13

Finally, Chime contends that its "notices to members to send texts only with consent" support that it did not know or avoid knowing that the text messages would be sent without consent. Dkt. No. 25 at 19–20. As White points out, this Court rejected a similar argument in *Jensen*. As in that case, Chime's "description of the notice is only partially accurate: the notice on the mobile app indicates that the customer should have received consent to send 'text messages' to the recipient, but not that the customer should have received consent to send this particular commercial text message." *Jensen*, 2025 WL 606194, at *6. As in *Jensen*, here, the "plain language of the notice, by referring to text messages in the plural, suggests that the consent at issue is the consent to send text messages in general, rather than this particular text message." *Id.*

In sum, White plausibly alleges Chime knew or consciously avoided knowing its users were sending messages in violation of the CPA.

3. <u>CEMA's statutory purpose does not support excluding the RAF program.</u>

Finally, Chime argues that "[o]rdinary principles of statutory interpretation and the plain language of CEMA show that Chime did not 'assist the transmission' of Plaintiffs' RAF texts" and that construing CEMA's substantial assistance provision to exclude Chime's RAF program "is consistent with CEMA's statutory purpose." Dkt. No. 25 at 20. In Chime's view, the "assistance" language in the statute is meant to target tools with the sole purpose of violating the statute, such as "mass texting programs, spam bots and the like." *Id.* Chime claims that "[b]y prohibiting 'assist[ing] the transmission' of certain commercial texts, the Washington legislature did not intend to introduce expansive secondary liability." Dkt. No. 25 at 20. Such a reading, according to Chime, is further supported by the Washington legislature's 2005 amendment which added a "broad exclusion" for secondary liability. *Id.*

Chime's argument is inconsistent with the fact that, in 2003, "the Washington legislature, recognizing the 'serious concerns' posed by the increase in unsolicited commercial text messages,

ORDER ON MOTION TO DISMISS - 14

amended CEMA *to expand* its scope of prohibited electronic practices." *Robinhood Fin. LLC*, 2022 WL 3082969, at *2 (emphasis added) (citing 2003 Wash. Laws 137 § 1). And, as previously discussed, the Court finds that the 2005 amendments were meant primarily to exempt telecommunications intermediaries. Had the legislature wished to exempt other categories of commercial entities assisting in the transmission of unsolicited commercial text messages, it could have indicated as much. Finally, this Court joins many others in this district that have, after the 2005 amendments, denied motions to dismiss involving similar refer-a-friend programs. *Jensen*, 2025 WL 606194, at *5; *Robinhood Fin. LLC*, 2022 WL 308296, at *4; *Lyft, Inc.*, 2016 WL 7971290, at *4; *Block, Inc.*, 2024 WL 1931690, at *4. These decisions are consistent with the Washington Supreme Court's directive to "construe remedial consumer protection statutes … liberally in favor of the consumers they aim to protect." *Jametsky*, 317 P.3d at 1007.

As such, the Court declines to adopt Chime's statutory construction, and accordingly denies its motion to dismiss.

### III.  CONCLUSION

The Court DENIES Defendant's motion to dismiss. Dkt. No. 25. The Clerk is directed to file a class action joint status report order for the parties to use in preparing their report.

Dated this 29th day of May, 2026.

Kymberly K. Evanson
United States District Judge

ORDER ON MOTION TO DISMISS - 15